McGee, Judge, v. Kennedy.

---

CASE 4.—PROHIBITION PROCEEDING BY WILLIS KENNEDY AGAINST J. WHEELER McGEE, POLICE. JUDGE CITY OF LOUISVILLE, TO RESTRAIN HIM FROM ENFORCING A JUDGMENT.—December 18.

## MeGee, Judge, v. Kennedy

Appeal from Jefferson Circuit Court; (Common Pleas Branch, Third Division).

MATT O'DOHERTY, Judge.

Judgment for plaintiff, defendant appeals—Reversed.

1. Health—Building Regulations.—The right of an owner of land in a populous community to erect buildings on the land in-

tended for the resort of great numbers of people is subject
to the police power of the state.

2.  Municipal Corporations—Police Power—Building Regulations
—Reasonableness.—An ordinance of a municipal corporation
requiring that theaters thereafter erected shall have at least
five separate exits from the main auditorium floor, one in
front at least 12 feet in the clear, and two on either side at
least 5 feet in width, the front corridor leading to the street
to be fireproof and not more than feet in length, and, if bal-
cony exits empty into such auditorium or corridor, such
corridor snall be widened 10 feet, is not oppresssive and
unreasonable.

3.  Building Regulations—Violation—Defenses—Effect of Permit.
—An ordinance of the city of Louisville provides that theater
buildings thereafter erected "shall have at least five separate
and distinct exits from the main auditorium floor, one in
front at least 12 feet in the clear, and two on either side
at least 5 feet in width; front exit, if not immediately on
the public street, shall lead to the public street through a
corridor or passageway, which corridor or passageway shall
be fireproof, no less in width than the exit, and not over 30
feet in length; and if balcony exits empty into said passage-
way, or into auditorium and thence into passageway, it shall
be widened 10 feet." Another ordinance of said city provides
that the building inspector shall have power to pass on any
questions arising under the building ordinances, provided that
and in case of objection to his decisions the matter sha be re-
ferred to the board of public safety, and the decision of
such board shall be final and conclusive. Kentucky
Statutes, 1903, section 2861, authorizing the creation
of the board of public safety, confers on that board
exclusive control, under the ordinances of the general council,
of all matters relative to the department of buildings. The
building inspector having rejected the plans for a proposed
theater building, the applicant for the permit appealed to the
board of public safety, and such board granted the permit.
Held, that the provisions of the ordinance as to the exits
were mandatory, and it was not within the power of the board
of public safety to set aside its requirements, and, the per-
mit issued by such board being no more than a mere license,
the applicant therefor was liable to prosecution for violation
of the ordinance, though the permit was not withdrawn and
the applicant had partially constructed his building.

4.  Issuance of Permit—Conclusiveness of Decision of Officers.—
If the ordinance conferring power on the board of public

safety could be construed as authorizing them to waive the mandatory provisions of the building regulations enacted by the council, such ordinance would be violative of the city charter and the state Constitution

HILL SPAULDING and E. P. HUMPHREY for appellant.

FAIRLEIGH, STRAUS & FAIRLEIGH for appellee.

(No briefs—Record out of office.)

OPINION OF THE COURT BY JUDGE NUNN—Reversing.

OPINION OF THE COURT BY CHIEF JUSTICE O'REAR—Reversing.

Under legislative authority conferred in the charters of cities of the first class in this Commonwealth, such cities are empowered to regulate the construction of buildings within their corporate limits. so as to promote the public safety. By virtue of this authority Louisville created an administrative board, called the "Department of Buildings." It is composed of a building inspector and assistant and the members of the board of public safety; the latter supervising the acts of the former as an appellate body, in case of difference between the inspectors and builders. By an ordinance of the city an elaborate system is provided regulating the granting of permits to build, repair, and remove houses in the city, having reference exclusively to the public safety, and being an exercise by the municipality of the police power of government. Many of the details of this ordinance are technical, and may appear to those unfamiliar with the building trade and with architecture to be complicated. and involved. Still other provisions are simple and plain. Some of them

we have no doubt are directory only, and leave ample room for the exercise of discretion and judgment by the board of inspectors. Among the plain provisions may be noted the primary one that, before any person shall be authorized to erect a new building in the city, he must obtain a permit from the inspector, or, if refused by him, then from the board of public safety. To proceed without a permit is a punishable offense under the ordinance. On the other hand, should the builder depart from the permit granted, or do the work in such an unskillful manner as to make the building unsafe, he may be estopped by the written order of the inspector, and required to remove the objectionable work, and, if he refuses to obey, he may be fined. These two illustrations are selected as indicating the two principal general features of the ordinance: One, to show that to build without a permit is unlawful; the other, to show that in the matter where there might arise, and does arise, a difference of opinion between the builder and the city authorities as to the manner of the execution of the work, the action of the authorities in condemning it must be formal and precede the penalizing of the particular act complained of.

One Hynicka applied to the building inspector of Louisville in May, 1908, for a permit to build a theater, which it was proposed to erect in the interior of the block bounded by Third, Fourth, Jefferson and Market streets. The front of the buildings was to be toward Jefferson street. Jefferson street, upon that block, is wholly occupied by other buildings on the street front, and at the point we are considering the other buildings extended back at least 100 feet. In order to reach the proposed theater building, it was planned to convert a ground-floor storeroom of

one of the buildings fronting on Jefferson into a passageway or corridor, something less than 20 feet wide, and extending back for its length of 100 feet till the new building was reached. This corridor was to constitute the main .entrance to the theater building. The building inspector rejected the plans and refused to grant the permit. Hynicka prosecuted an appeal to the board of safety, who approved the plans and granted the permit. After considerable work had been done on the building, and when the workmen began the work upon the corridor mentioned, warrants were sworn out against them in the Louisville police court, charging them with a violation of section 87 of the building ordinance of the city. They were arrested, arraigned, and fined in the police court. Thereupon this suit was filed in the circuit court for a writ of prihibition against the judge of the police court, restraining him from enforcing the judgments. The circuit court granted the writ. The police judge has appealed to this court.

It must be conceded that, if the police judge had jurisdiction of the offense charged—if one was charged—and was proceeding regularly in passing to a judgment upon the cases, he could not be interfered with by the writ of prohibition, however erroneous his judgment, provided he was acting not corruptly. The contention is made that he was without jurisdiction because—as held by the circuit court—the ordinance under which the prosecutions were had was oppressive and an abuse of power by the city council, being an undue interference by public authorities with the right of private ownership of property, and, in addition, that the ordinance, properly construed, does not penalize the offense charged, consequently it was not triable criminally; that the applicant for

the writ had been tried and punished for an act not unlawful, and the punishment inflicted, and which would be repeated, was too small to entitle him to appeal from it, hence he was without other remedy. Conceding, for the purpose of this case, that the premises recited, if true, justified the employment of the writ of prohibition, we will examine into the assertions of fact and law upon which the remedy is asked.

It is not argued here for appellee that the city could not, in the exercise of the police power, regulate the matter of where and how such buildings, the resort of large crowds at frequent intervals, should be constructed. Every person holds the title to his property subject to the power of the government to control its use, so that it will not imperil the public safety. When the owner of land undertakes to improve it, whether by mining and excavating, or by putting or maintaining buildings on it, his right in respect thereto is subject to the same implied power of the government to prevent his doing with his own property that which would tend to inflict death or injury upon members of the public. In populous communities the necessity for the exercise by the government of the police power of regulating the use of property which might inflict injury upon the public is 'more apparent; and as to those structures which are intended as a resort for great numbers of people at a time, such as theaters, hotels, railroad passenger depots, tenement houses, school buildings, and the like, the reason and justification for its exercise is still more apparent. Fire districts, and the building of dangerously inflammable structures in thickly populated communities, or tall buildings, to be used by tenants or workmen, without being provided with fire escapes, are all familiar subjects of such legisla-

tion. Its purpose is preventive, rather than punitive. The law will not allow people to build death-traps on their land and open them for the public, coaxing them to death and disaster. It will not need citation of authority at this day to uphold the exercise of the police power of government over such matters. But it is always a question, and is about the only limitation upon the police power, whether its attempted exercise is reasonable, or is oppressively or capriciously exercised.

The ordinance in question, with respect to theater buildings, requires: "Every theater * * * hereafter erected with main auditorium floor, balcony and gallery, or auditorium floor and balcony, shall have at least five separate and distinct exits from main auditorium floor, one in front at least 12 feet in the clear, and two on either side at least five feet in width; front exit, if not immediately on the public street, shall lead to the public street through a corridor or passageway, which corridor or passageway shall be fireproof, no less in width than the exit, and not over 30 feet in length; and if balcony exits empty into said passageway, or into auditorium and thence into passageway, it shall be widened 10 feet." It has not been pointed out to us, nor are we able to see, wherein this ordinance is oppressive upon the property holder. On the contrary, it seems to have been aimed well for the public's safety, for it is known that large crowds frequent theaters, and that in case of fire they become excited, and in the stampede, if obstructed in their flight to escape from the building, crowd and jam the passage, most frequently thereby causing greater injury and loss of life than the fire itself. Hence the well-known necessity of

vol. 131—2

providing ample exits to allow the building to be emptied speedily into a place of safety. To empty the building into a long narrow corridor, itself perhaps aflame, would be to augment the terror, confusion, and loss of life in the crowd. To turn a jug upside down, forcing its whole contents with a rush into its narrow neck and opening, is to obstruct its emptying, whilst a bucket, with its more ample opening, might be so used with the intended effect. We think the ordinance is not objectionable on the ground that it oppressively interferes with the owner's proper use of his private property.

Section 184 of the ordinance imposes a penalty of from $5 to $50 for each violation of any of its provisions for which a penalty is not otherwise prescribed. There is no other penalty prescribed for violating the provisions of section 87, above mentioned. But it is contended that the permit issued by the board of public safety in this instance was a complete protection to the builder and his workmen. Section 6 of the building ordinance reads: "Said building inspector shall have full power to pass upon any question arising under the provisions of this ordinance relative to the manner of construction, or material to be used in the erection, alteration or repair of any building. Provided, however, that should any question arise between building inspector and the owner or architect of any building, or should the owner or architect object to any order or decision of said inspector, the matter shall be referred to the board of public safety, and its decision shall be final and conclusive."

Section 2861, Ky. St. 1903, which authorizes the creation of the board of public safety, gives that board "exclusive control, under the ordinances of

the general council, of all matters relating to * * * the department of buildings." For appellee it is argued, and the circuit court held, that the power thus conferred upon the board of public safety was not circumscribed by the ordinance of the city,, but as between the city and third persons, in a collateral inquiry, the license or permit issued by the board was a complete protection to the person operating under it. It is to be observed that the Legislature has put the board of public safety under the general council, not over it. The exercise of the police power of government, in determining what regulations of property shall be ordained, is a legislative function wholly. The board of public safety is not a legislative body, but is purely executive. The general council could not, nor could the Legislature, have delegated to that board the function of legislating. Nor have they attempted to do so. If the board could prescribe what is and what is not prohibited in buildings, or could set at naught the legislative discretion and judgment of the city council on the subject and apply and enforce its own contrary judgment, if there was no limitation upon the power of the board in such matters, then it would follow that the board, and not the general council, possessed the power of legislation, as well as that of the executive, in prescribing what might be deemed hurtful to the public, and in allowing what was believed to be harmless.

When it was said in the ordinance (section 6, supra) that the "decision of the board shall be final and conclusive," it was never intended to enlarge its powers or authority, but to cinch such authority as had been given to it. It was not intended by that expression to take the bridle off the board. But whatever it did within its power was not subject to

any further appeal. That was intended as the final executive discretion in the matter. It was not, and could not have been, the purpose of the council by that expression to undertake to preclude the courts of the land from looking into the action of the board in any proper case to determine whether it had acted corruptly, or had acted only upon appeal from the inspector, or had acted in a matter which by the law was committed to its jurisdiction. Ours is a government of limitations—else written constitutions would be nothing more than polished essays. Legislatures, courts, and the executive departments all have limitations placed upon their action, beyond which their action is void. The inquiry may be made as to any statute, of any judgment of any court, or of any act of any executive: Was the act beyond the powers granted? To the board of public safety was granted the power of passing in appeal on the application for a proposed building. The city ordinance giving them the power placed limitations upon it. The language of the ordinance in the particular we are noticing (section 87, supra) is in some parts mandatory. "Thou shalt" and "thou shalt not" are the highest forms of command. When a statute says a building, before allowed, shall have at least five fire escapes, it does not mean it may have less, or that five are advised; and when it says the main corridor leading to a public street shall not exceed 30 feet in length, it does not mean that it may, however, in the discretion of the inspector or board, be 100 or 1,000 feet in length. It means what it says, and is an express limitation upon the power of the inspector and the board, the excess of which is void.

The ordinance gives the inspector and the board the power to grant permits, but limits the power by

McGee, Judge, v. Kennedy.

the mandatory injunctions imposed. Any action of the inspector or board beyond the limitation imposed is unauthorized, and, being so, is void. If this were not so, then the discretion of the legislative body as to what limitations should not be exceeded could not be set at naught by the subordinate body; for if the permit were a protection to the holder, without reference to the inhibitions contained in the ordinance, then it would follow that the permit, and not the ordinance, would be the test of the builder's authority. A building permit is a license in a sense. In Spake v. People, 89 Ill. 607, involving the validity of a license to sell liquor which had been issued upon the payment of less than the minimum fee allowed by law, it was said: "The payment of a less sum than that required by law does not authorize it to be issued, and, if issued contrary to law, it is a nullity." So in Millet v. Princeton, 167 Ind. 582, 79 N. E. 909, 10 L. R. A. (N. S.) 785, it was held that a permit issued in violation of the statute was void. In New York City v. Wineburgh, 122 App. Div. 748, 107 N. Y. Supp. 478, and Kobbe v. New York City, 122 App. Div. 755, 107 N. Y. Supp. 489, injunctions were granted to prevent the violation of the building law, although permits had been granted thereunder.

It is admitted that the courts might, at the instance of the city, acting through the board of public safety, grant an injunction against the erection of a building in violation of an ordinance, or might cancel the permit. But we apprehend that the permit, if issued by the proper officials, in the exercise of their discretion, could not, merely because of a change of opinion, or even upon fuller consideration, be withdrawn by the board, or the city; for, if it were issued not contrary to law, it confers such rights as, when

exercised in conformity to the permit, could not be revoked. For what was right when issued, and subsequently acted upon by the builder, could not be converted into a wrong by the act alone of the licensing board. While we have no doubt that if the permit were obtained by fraud, or was issued in violation of the ordinance, the city might recall it, and might, if necessary, call in aid the jurisdiction of a court of equity, still that is not the sole remedy. It is competent for the city to make a violation of the ordinance a penal affense, in addition to such civil remedies as the law may afford.

Certain features of the building ordinance are within the discretion of the inspector or board—many of them—which are matters of detail, and which are, like many other discretionary duties, imposed upon pure by administrative officers. In the section under investigation (section 87) there might be selected several illustrations, e. g.: Each theater is required to have not less than five separate and distinct exits. The minimum number is the limit of the board's power in that direction, but it might require more than five exits where in their judgment a greater number was needed. The main entrance is required to open upon a public street, either directly or through a corridor. It is mandatory as to the fact that it must open upon a public street, but whether it should be situated directly upon the street, or farther back, connecting by a corridor, is within the discretion of the inspector or board to permit. If the entrance is through a corridor, the corridor is required to be fire-proof; but, from the nature of the subject, it is necessarily within the jurisdiction of the inspector or board to declare what is a sufficient compliance with the requirement. But the corridor must not be more than 30 feet long.

It can not be materially longer. It may be (and that is within the discretion of the inspector or board to allow) required to be shorter. As to matters within the discretion of the board, the ordinance makes their action final. As to matters beyond or in excess of their authority, the ordinance could not make their action final, because the law of the land is to the contrary, and an ordinance can not exist in repugnance to the general law of the land. Such excessive action is violative of the city charter, and, even if authorized by the ordinance, would have been violative of the Constitution of the State. But such unrestrained, arbitrary power was not conferred by the ordinance, and could not have been.

Our conclusion is that the permit in this case, being in violation of the ordinance of the city, was unauthorized, void, and, in so far as it attempted to confer authority to build a theater building with such a corridor entrance, conferred neither right nor protection to those operating under it.

Considerable stress was laid in the argument upon the hardship imposed upon the owner, because he has been allowed by public authority to invest large sums of money in the building, which is now made practically worthless, because it can not be completed upon the plans upon which it was begun. The question of hardship has small place in the merits of this case. The owner brought upon himself deliberately, and in spite of the opposition of the building inspector and the protest of citizens, and with full knowledge of the possible consequences of his act, all that he now complains of. He knew, in fact, of the ordinance, and took the chances of its being declared valid and upheld. Besides, as between hardships upon property owners in matters of police regulation and the dan-

ger to human lives, which are the subject of the protecting care of the measure, the latter are first to be considered. It is the disregard of life, as against the regard for profit, that has made it necessary for the State to intervene by such measures as this to protect the latter. It is better to stop the building of a structure, which appears to be better suited for a death-trap than a place of innocent amusement, than to subsequently mourn the loss it has entailed and then require it to be closed or torn down.

. Judge McGee's judgment was seasoned with good sense and mercy toward those innocent of intent in violating the ordinance. The owner was a non-resident. The principal contractor was not to be found. The judge, in passing his judgment, observed: "Defendant Willis Kennedy was foreman of the work, and seems to have had full knowledge of the plans and specifications, and of the terms and limits of the so-called permit, and I will allow a fine of $15 against him. The other defendants were simply at work constructing that part of the corridor that extended beyond the 30 feet from the street. It is possible they did not actually know they were violating the ordinance, although they must be presumed to have known. I will impose a fine of $15 on each of them, and allow the fine to be suspended during their good behavior."

The judgment of the circuit court, granting the writ of prohibition, is reversed, and cause remanded, with directions to dismiss the petition.

JUDGE HOBSON dissents.


DISSENTING OPINION BY JUDGE HOBSON.

After the building inspector refused to issue the permit in question the board of public safety, upon

an appeal to them, granted it. A motion was made before them to reconsider the matter, and after a full hearing they declined to recall the permit. Under the permit thus issued by the board of public safety, and thus sanctioned by it, appellees worked upon the building, and were arrested for thus working upon it. This is the only charge made against them; and if there is no law warranting their being fined for working upon this building, the police court was without jurisdiction to punish them, and the writ of prohibition was properly granted. The police court is of special jurisdiction; and where it proceeds without jurisdiction, as where there is no authority of law inflicting a penalty for the act charged, it may be proceeded against by prohibition in the circuit court, in the absence of any other remedy. Were the rule otherwise, there would be no protection to personal security from the police courts. The following decisions by this court recognize this rule: Shinkle v. Covington, 83 Ky. 420, 7 Ky. Law Rep. 412; Owensboro v. Sparks, 99 Ky. 351, 18 Ky. Law Rep. 269, 36 S. 801, 76 S. W. 828, 25 Ky. Law Rep. 857; Bardstown v. Hurst, 121 Ky. 119, 89 S. W. 147, 724, 28 Ky. Law Rep. 603.

The circuit court granted the writ of prohibition; so the only question before this court is: Did the court grant it properly? If there is no provision in the ordinance for the punishment of the acts of the defendants complained of, its granting the writ of prohibition was proper, and no other question arises in this court; for the only question before this court is: Did the circuit court properly grant the writ of prohibition? The answer to this question depends upon the question: Is there any provision of the ordinance for the punishment of laborers on the building in question

after its erection was authorized by the permit issued by the board of public safety?

The ordinance is a very long one, covering 64 pages of the Biennial Compilation. It consists of 186 sections, and by the 184th section it is provided that: "Any person violating any provision of this ordinance, for which a penalty is not already prescribed, shall be fined in a sum not less than five nor more than fifty dollars for each violation."

The ordinance covers a great many things. It regulates all manner of buildings. That part of it relating to theaters is contained in sections 82-100. Section 82 provides what shall be deemed public halls. Section 83 regulates the height; section 84, the stairways; section 85, the material that may be used; section 86, the exits. Section 87, under which the prosecution was had, is as follows: "Every theater, opera house, or other similar place of amusement hereafter erected, with main auditorium floor, balcony and gallery, or auditorium floor and balcony, shall have at least five separate and distinct exits from the main or auditorium floor, one in front, at least twelve feet in width in the clear, and two on either side at least five feet in width; front exit, if not immediately on the public street, shall lead to the street through corridor or passageway, which corridor or passageway shall be fireproof, no less in width than the exit, and not over thirty feet in length; and if balcony exits empty in said passageway, or into auditorium and thence into passageway, it shall be widened ten feet. There shall be at least four distinct and separate exits from balcony floor, two in front, which may empty in passageway leading from main or auditorium floor, or may lead directly to the street, and one on either side of balcony at least sixty feet from front exits.

These exits shall be at least five feet wide, and lead directly to the ground by iron stairways not less than four feet in width. There shall be at least four separate and distinct exits from the gallery, two in front leading directly to the street, and one on either side of gallery, at least sixty feet distant from front exits, leading to the ground, both by iron stairways not less than four feet in width, exits to be each five feet wide. The main or auditorium floor of all theaters, opera houses, or other similar places of amusement, shall be flush with the sidewalk or pavement." Section 88 regulates the thickness of the walls; section 89, the workshops and storage rooms; section 90, the skylights; section 91, the fly galleries; section 92, the dressing rooms; section 93, the stage exits; section 94, the seats; section 95, the aisles; section 96, the balconies; section 97, the heating furnaces; section 98, the radiators; section 99, repairs on theaters; section 100, lessees of theaters not now in use as such.

There are a number of things in the ordinance to which section 184 manifestly refers, as, for instance, the obstruction of sidewalks, working on a building after it has been ordered stopped by an inspector, the use of material condemned by him, and the like. But it was manifestly not intended that every laborer on a building could be fined if the theater had not at least five separate and distinct exits, or if the main exit was 11 feet wide, instead of 12, or if the corridor was 31 feet long, and not 30, or if the exits from the balcony were four feet wide, instead of five, or there were three exits from the gallery instead of four, or they were within 60 feet of the front exits. Whether a building not substantially complying with the statute could be used as a theater without a violation of the ordinance by the owner or operator is a question

not now before us.. The incomplete building, which the appellees have been fined for working upon, is not a theater, and will not be a theater, within the mean-- ing of the ordinance, until it is completed and used for that purpose. The owner has until them at least to make such changes in it as may be necessary to con- form it to law. The purpose of these provisions is to secure the safety of persons attending the theater, and until the building is completed, and is used as a thea- ter, there is no violation of any of these provisions. Buildings are often constructed for one purpose and used for another. This building may never be used for a theater, or, if it is, every objection now made to it may be removed before that time; and yet appellees have been fined for working on the building because the corridors as now projected are more than 30 feet long. To hold that the appellees are liable under these circumstances is entirely to ignore the provisions of the law that the action of the board of public safety in granting a permit shall be final (section 17 of the ordinance); the manifest meaning of this being that, when the board of public safety issues a permit, no one shall question the right to construct the building, and that people may work on it without question.

To say that every laborer on a building must know that it complies with all the provisions contained in the 180-odd sections of this ordinance is to give no force to the provision of the ordinance that the action of the board of public safety shall be final. The erec- tion of buildings is within the jurisdiction of the board of public safety. The use to which buildings may be put after they are erected may be controlled by the general council, under appropriate ordinances, for the protection of the public in the exercise of the police power. But the right of the council to protect the

public from death-traps, from inadequate exits at theaters, only exists when buildings are used as theaters. There is not a line in the ordinance indicating any intention to punish laborers on a building because. when completed, if used as a theater, it may not come up to some of the requirements of the ordinance. It is an elementary principle that crime is never created by implication; that to punish for crime there must be an express declaration of the law making the act penal. It is said that an ancient law-giver wrote his laws in small letters and hung them up very high, so the people could not read them, and the unwary would thus be caught. But this is a clumsy contrivance for catching the unwary in comparison with this ordinance, if it is construed to mean that laborers are to be punished under its provisions for working on buildings under a permit of the board of public safety, where the building does not come up to the requirements of the ordinance if used for a specified purpose.

No weight can be given the fact that the police judge suspended the judgment as to some of the defendants during good behavior. This order may be set aside at any time. He has no power to put the defendants under obligation to be of good behavior when they have committed no offense, and he does not possess the power to grant a pardon, reprieve, or respite.

I therefore dissent from the opinion of the court.

JUDGES BARKER *and* NUNN concur in this dissent.